IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC T. ALLEN, SR. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PASSAIC COUNTY JAIL, ET AL. | : | NO. 09-0408 |

O'NEILL, J.                                                          December 4, 2009

## MEMORANDUM

On February 2, 2009, plaintiff Eric Allen filed a *pro se* complaint against the Passaic County Jail, the Philadelphia Prison Systems and Philadelphia Prison Commissioner Louis Giorla alleging that numerous prison conditions related to his incarceration at the Passaic County Jail constituted violations of his constitutional rights. He brings suit under 42 U.S.C. § 1983. Before me now is defendant Passaic County Jail's motion to dismiss plaintiff's complaint against all three defendants[1] and plaintiff's response thereto.

## BACKGROUND[2]

Allen was incarcerated in the Passaic County Jail beginning on approximately June 1, 2008 and was released sometime before May 15, 2009.[3] Upon his arrival at the Jail, he was given a handbook which stated, in relevant part, that inmates would receive at least two hot meals a day, inmates would have showers with hot water, 10% of the gross of all proceeds from

---

[1]     Defendant Giorla filed an answer with affirmative defenses on March 23, 2009. Passaic County Jail did not answer, but rather filed the present motion to dismiss on April 3, 2009.

[2]     I accept as true all well-pleaded facts in plaintiff's complaint together with reasonable inferences that may be drawn therefrom. Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).

[3]     Allen filed a letter with the Clerk's office dated May 15, 2009 noticing his new address. (D.E. #16).

commissary purchases would be for the Victims of Crime Compensation Board of New Jersey, and all grievances filed with the Jail would receive a response in a reasonable period of time. During his time in the Jail Allen was consistently served cold meals, was without hot water for weeks at a time, and a 10% surcharge was added to his commissary purchases. On August 14, 2009, plaintiff registered a grievance seeking hot food, hot water and repairs to the toilets. He received no written response; however, the toilets were fixed. Three grievances were filed and letters were sent directly to the Deputy Warden, the Philadelphia Prison Society, and Philadelphia Prison Commissioner Giorla.[4] No responses to any of these grievances were received. On August 20, 2009, Allen asked the Deputy Warden and Captain Speranza about the grievances and why no response had been received. The Deputy Warden stated he had not received them; Captain Speranza stated he had received them and no formal response was issued because he had fixed the problem. Allen told Captain Speranza and the Deputy Warden that there had been no hot water since August 12. They stated the problem would be fixed. There was no hot water until November 29; subsequently, there was no hot water again from January 5 until the date Allen filed his complaint.

Allen was convicted of his crime in a Philadelphia. He was transferred to the Jail in New Jersey because of overcrowding in the Philadelphia prisons; therefore, he was not able to participate in any of the programs to prevent recidivism offered at the Philadelphia Prison System's House of Corrections located on State Road in Philadelphia. Allen alleges that the

---

[4] It is unclear whether there were a total of three grievances filed or whether three more grievances were filed after the first one. It is also unclear whether the grievances and letters were filed by plaintiff or by other inmates. For purposes of this opinion, I will assume plaintiff filed four grievances and wrote the letters.

Philadelphia Prison System and Philadelphia Prison Commissioner Giorla knew the Jail to be

overcrowded and of the other complained-of conditions at the Jail and were negligent in

contracting to send Philadelphia inmates to the Jail. During his incarceration Allen could only

make collect calls, could not attend religious services at the Jail, was unable to participate in any

of the Jail's programs to prevent recidivism and was only permitted one hour a day of recreation.

Allen seeks monetary damages of $5,000 per month of incarceration for pain and

suffering, $12.90 per day for lost phone time, and reimbursement for the ten per cent commissary

fee. He also requests injunctive relief in the form of shutting down the Passaic County Jail.


STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action

for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When

ruling on a defendant's motion to dismiss, I must accept as true all of the well-pleaded facts

alleged in the complaint. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Federal Rule of

Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the

pleader is entitled to relief." "Specific facts are not necessary; the statement need only 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v.

Pardus, 551 U.S. 89, 93 (2007), quoting Twombly, 550 U.S. 544 (2007). "A document filed pro

se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be

held to less stringent standards than formal pleadings drafted by lawyers." Id. at 94, quoting

Estelle v. Gamble, 429 U.S. 97, 106 (1976); citing Fed. R. Civ. Proc. 8(f) ("All pleadings shall be

so construed as to do substantial justice"). The court has an additional duty under several federal

statutes to review civil complaints filed by prisoners against a government entity and dismiss any portion of the complaint that fails to state a claim upon which relief may be granted or that seeks monetary relief from a defendant who can assert immunity. See 28 U.S.C. §§ 1915(e)(2) and 1915A; 42 U.S.C. § 1997e(c).

DISCUSSION

I.      **New Jersey Class Action Lawsuit**

Before deciding the motion to dismiss, I must first address whether Allen's case may be brought in this Court in light of a class action lawsuit pending before the United States District Court for the District of New Jersey. See Imprisoned Citizens Union v. Shapp, 977 F. Supp. 335, 341 (E.D. Pa. 1996), citing McNeil v. Guthrie, 945 F.2d 1163, 1165-66 (10th Cir. 1986) ("cases addressing the alleged right of a class member to proceed *pro se* rather than through class counsel conclude that such action is inappropriate."); Ratliff v. Fields, 1999 WL 381126, at *1 (10th Cir. June 11, 1999) ("[w]hen there is an existing class action, individual suits alleging unconstitutional prison conditions related to the same facility may not be brought."). On September 3, 2008, a group of inmates at the Passaic County Jail represented by counsel and the ACLU filed suit under § 1983 seeking solely injunctive and declaratory relief for,

> (1) overcrowding, leading to a lack of privacy, loss of sleep and the
> threat of inmate violence;
> (2) unsanitary living conditions;
> (3) inadequate medical care;
> (4) unsafe and inadequate food;
> (5) inadequate temperature control and ventilation;
> (6) inadequate clothing;
> (7) inadequate fire detection and alarm systems;
> (8) use of excessive force by Correction Officers, including the use

of dogs for intimidation;
(9) restrictions on religious freedom; and
(10) retaliation for airing grievances.

The class action complaint alleges "(1) violation of the Fourteenth Amendment prohibition on unlawful punishment of pre-trial detainees; (2) violation of the Eighth Amendment prohibition on cruel and unusual punishment of sentenced inmates; (3) violation of the First Amendment right to the free exercise of religion; (4) violation of the First Amendment due to alleged retaliation against inmates; and (5) violation of the First Amendment due to alleged restrictions on inmate access to the courts." Colon v. Passaic County, 2009 WL 1560156, at *1 (D. N.J. May 27, 2009). On May 27, 2009, under Federal Rule of Civil Procedure 23(b)(2) Judge Cavanaugh certified a class of "all persons who are now or will become incarcerated at [Passaic County Jail] during the pendency of this lawsuit." Id. at *2. Allen's incarceration at Passaic County Jail began on or about June 1, 2008 and Allen's complaint alleges a loss of hot water in early January 2009. Therefore, it appears that Allen was an inmate at Passaic County Jail on September 3, 2008, which is during the pendency of the Colon case.

On August 7, 2009, I ordered defendants to research and brief Allen's eligibility for inclusion in the Colon v. Passaic County certified class. After reviewing the brief, I conclude that Allen may proceed with his *pro se* complaint for the following reasons. First, the class action plaintiffs seek only injunctive and declaratory "appropriate and necessary to ameliorate the current conditions of confinement." Colon Complaint at ¶ 3. Allen, however, seeks primarily monetary damages, i.e. $5,000 per month of incarceration for pain and suffering, $12.90 per day for lost phone time, and reimbursement for a ten per cent commissary fee. While Allen also requests injunctive relief in the form of shutting down the Passaic County Jail, this relief is

wholly apart from that injunctive and declaratory relief sought by the class action plaintiffs.

Allen is no longer imprisoned in the Passaic County Jail and any injunctive relief awarded in that

action would not address his alleged injuries. Second, the class action plaintiffs seek relief from

Passaic County, the Board of Chosen Freeholders, the Sheriff's Department, Warden, Deputy

Warden and Commissioner of the New Jersey Department of Corrections. In contrast, Allen

does not name any of these defendants in his complaint. Finally, while some of the allegations

between the class action plaintiffs and Allen overlap (e.g., overcrowding, unsanitary living

conditions and restrictions on religious freedom), the class action plaintiffs' grievances do not

encompass all of the grievances alleged by Allen.[5] Therefore, I will proceed to address the

defendant's motion to dismiss.

## II.    Section 1983 Claims

Defendant moves to dismiss plaintiff's complaint alleging a violation of § 1983 for

failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Section 1983

provides an avenue for individuals to adjudicate violations of rights secured under federal

constitutional or statutory law. Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005). A valid

claim under § 1983 must plead adequately three elements: (1) defendants acted under color of

law; (2) defendants violated plaintiff's federal constitutional or statutory rights and (3) that

---

[5]    Defendants argue that to the extent plaintiff's claim seeks injunctive relief it should be dismissed in favor of the class action. However, because I find the nature of injunctive relief sought by plaintiff is entirely different than that sought by the class action plaintiffs, and because the injunctive relief is sought from completely separate defendants and for different grievances, I will not grant defendant's motion on this basis.

violation caused injury to plaintiff.  Id.[6]  Defendants argue that plaintiff's complaint must be

dismissed because none of the defendants have violated any of plaintiff's federal constitutional or

statutory rights.

In Turner v. Safley, 482 U.S. 78 (1987), the Supreme Court established the standard of

review for prisoner constitutional claims: "when a prison regulation impinges on inmates'

constitutional rights, the regulation is valid if it is reasonably related to legitimate penological

interests."  Id. at 89.  The Court of Appeals elaborated on this standard in DeHart v. Horn, 227

F.3d 47 (2000):

> [T]his standard of review requires a court to respect the security,
> rehabilitation and administrative concerns underlying a prison
> regulation, without requiring proof that the regulation is the least
> restrictive means of addressing those concerns, it also requires a court
> to give weight, in assessing the overall reasonableness of regulations,
> to the inmate's interest in engaging in constitutionally protected
> activity.

227 F.3d at 51.  The Turner reasonableness test includes four factors for consideration:

> 1) whether there is a legitimate rational connection between the
> prison regulation and the governmental interest;
> 2) whether the prisoners have alternative means of exercising the
> constitutional right at hand;
> 3) the impact that accommodation of the constitutional right would
> have on other prisoners, guards, and prison resources in general; and
> 4) the availability of alternatives to the regulation.

---

[6]      With respect to the last element, plaintiff must allege an injury in fact that
establishes that the allegedly unconstitutional conditions injured him personally.  Nickens v.
Department of Corrections, 277 Fed. Appx. 148, 149-150 (3d Cir. 2008), citing Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); UPS Worldwide Forwarding, Inc. v. United
States Postal Serv., 66 F.3d 621, 626 (3d Cir. 1995).  As a corollary a prisoner lacks standing to
raise claims on behalf of others.  Thus, to the extent plaintiff alleges injuries to "Philadelphia
inmates" incarcerated at Passaic County Jail generally, plaintiff lacks standing to seek relief with
respect to those injuries.  I will construe those allegations to apply only to plaintiff.

482 U.S. at 89-90.  See also Waterman v. Farmer, 183 F.3d 208 (3d Cir. 1999).  Plaintiff raises

claims under the First, Eighth and Fourteenth Amendments.  Each is addressed individually.

### A.     First Amendment

#### 1.     Collect Calls Only

Plaintiff alleges that during his time at the Jail he was unable to talk to his family without

calling collect.  "The constitutional right at issue has been described as the right to communicate

with people outside prison walls, and 'a telephone provides a means of exercising this right.'"

Almahdi v. Ashcroft, 310 Fed. Appx. 519, 521-22 (3d Cir. 2009), quoting Valdez v. Rosenbaum,

302 F.3d 1039, 1048 (9th Cir. 2002).  "However, prisoners have no right to unlimited telephone

use, and reasonable restrictions on telephone privileges do not violate their First Amendment

rights."  Id. at 522, internal quotations omitted, citing Washington v. Reno, 35 F.3d 1093,

1099-1100 (6th Cir.1994).  "Rather, a prisoner's right to telephone access is 'subject to rational

limitations in the face of legitimate security interests of the penal institution.'"  Id., quoting

Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986).

Defendants argue that plaintiff's claim falls outside of the First Amendment.  I find that

the collect call restriction impeded plaintiff's ability to communicate with people outside the

prison walls and therefore implicates plaintiff's First Amendment rights.  Defendants have not

offered a legitimate security interest explaining the need for the collect call only policy.

Therefore, I will allow plaintiff's First Amendment claim to proceed.[7]

---

[7]     I find defendants' reliance on Dockins v. Ridge, 1998 WL 848119 at *3 (E.D. Pa.
Dec. 2, 1998), in which the plaintiff-prisoner brought suit under the Clayton and Sherman Acts
because the prison limited which providers prisoners could use to make collect calls is
misplaced.

## 2.     Ability to Attend Religious Services

Plaintiff alleges that he could not attend religious services due to over-crowding of the Jail.  Plaintiff has not alleged that his ability to practice his religion was restricted in any other way.  Defendants moves to dismiss this claim on the grounds that the Jail has a legitimate interest in ensuring the safety of its prisoners and that "deference should be granted to the prison officials provided that the regulation is reasonably related to legitimate penological interests."  Def. Br. In Supp. Of Mot. To Dismiss, 10, citing O'Lone v. Shabazz, 482 U.S. 342, 349 (1987).

The issue is whether plaintiff has alleged a violation of the Free Exercise Clause of the First Amendment.  With respect to the first factor of the Turner reasonableness test, defendant asserts that there is a legitimate rational connection between its regulation of attendance at religious services and its governmental interest in protecting the safety of its prisoners.  The court must "accord great deference to the judgments of prison officials 'charged with the formidable task of running a prison.'"  Sutton v. Rasheed, 2003 WL 1354099, at *11 (3d Cir. March 19, 2003), quoting O'Lone, 482 U.S. at 353.  This factor requires a two-fold analysis: "we must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." Id., quoting Thornburgh v. Abbott, 490 U.S. 401, 414-15 (1989).  Clearly, the safety of the inmates is a legitimate and neutral governmental objective, and limiting prisoner attendance at religious services in an overcrowded facility is rationally related to the objective of promoting prisoner safety.

The second factor focuses on whether the inmate "has alternative means of practicing his religion generally, not whether an inmate has alternative means of engaging in the particular

practice in question." DeHart, 227 F.3d at 55. Here, plaintiff has not alleged that he was prohibited from practicing his religion through alternative means, such as worshiping in his cell.

The final two factors "focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources." Sutton at *15, quoting DeHart, 227 F.3d at 57. This Court "should defer to prison officials when the accommodation 'will have a significant ripple effect on fellow inmates or on prison staff . . .'" Fraise v. Terhune, 283 F.3d 506, 520 (3d Cir. 2002), quoting Turner, 482 U.S. at 90. Plaintiff alleges he was prevented from attending the religious services described in the Jail's handbook and argues in his response that the overcrowding prevented him from being included in the "rotation" of inmates who could attend religious services. The defendants have not stated what impact, if any, allowing plaintiff to be included in the "rotation" would have had on other prisoners, guards, and prison resources in general.

The fourth Turner factor requires this Court to assess whether the alternatives to the regulation would impose only "de minimis cost to valid penological interests." Turner, 482 U.S. at 91. "The absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id. However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. Clearly, one alternative to defendant's regulation of completely prohibiting plaintiff from attending services would have been to allow him to "rotate" in and attend some services. Defendant has not stated what such an alternative would cost.

The defendants have failed to address the impact that the accommodation would have on

the Jail and its costs.  Thus, "the record is insufficient for this Court to determine whether the [Jail's policy] . . . is reasonably related to legitimate penological interests.  As a result, in the context of a motion to dismiss, [p]laintiff's allegations are sufficient to state a First Amendment free exercise of religion claim, and such claim should be allowed to proceed at this juncture."  Jefferson v. Wolfe, 2006 WL 1947721, *11 (W.D. Pa. Jul. 11, 2006).

### B.    Fourteenth Amendment

Plaintiff challenges the ten percent fee charged to all inmates for purchases made at the Jail's commissary.  First, he alleges that while the Jail's handbook states ten percent of the gross of all proceeds will be taken for the Victims of Crime Compensation Board of New Jersey, "they actually add 10% to the commissary."  The collection of the surcharge is authorized by New Jersey statute.  The statute states,

> Every commissary in a county or State correctional facility operated
> for the sale of commodities shall collect a surcharge of 10% of the
> sales price of every item sold. The surcharge shall be known as the
> "VCCB Surcharge."  All funds collected pursuant to this section shall
> be forwarded to the State Treasurer for deposit in the Victims of
> Crime Compensation Board Account, shall be subject to reporting
> and accounting procedures pursuant to the provisions of section 2 of
> P.L. 1979, c. 396 (C.2C:43:3.l) and shall be used in satisfying claims
> pursuant to the provisions of the "Criminal Injuries Compensation
> Act of 1971," P.L. 1971, c. 317 (C.52:4B-1 et seq.). A sale subject to
> surcharge under this section shall not be subject to any tax imposed
> under the "Sales and Use Tax Act," P.L. 966, c. 30 (C.54:32B-1 et
> seq.).

N.J. Stat. Ann. § 30:4-15.1  The plain language of the statute requires the Jail's commissary to add a surcharge of 10 % to every item sold.  Even assuming, as plaintiff alleges, that the policy in the handbook is inaccurately articulated, the Jail's practice of adding at 10% surcharge to purchases is fully consistent with the law.  Plaintiff has failed to state a claim upon which relief

can be granted.

I also construe plaintiff's complaint to allege Fourteenth Amendment due process and equal protection claims with respect to the VCCB surcharge.[8]  These claims are governed by Myrie v. Commissioner, N.J. Dept. of Corrections, 267 F.3d 251 (3d Cir. 2001), which rejected inmates' claims under the due process and equal protection clauses.  The Court stated that the surcharge must be "reasonably calculated to bring about in some significant degree the achievement of an appropriate legislative goal," and found that the VCCB surcharge is a civil remedial program designed to generate funds to help New Jersey compensate crime victims.  Id. at 258.  The Court held that the classification of inmates as the only group responsible was not "arbitrary and capricious," because "[i]t would seem . . . not unreasonable to infer that the Legislature regarded the inmate population as a cohort whose members were in large measure accountable for the victim harms for which adequate compensation had not been achieved."  Id. Furthermore, "noting the likelihood that some fraction of the inmate population would not, in fact, owe anything to the VCCB, [the Court] stated that 'this lack of one-to-one correspondence between a particular inmate's purchase and an identifiable and precisely quantifiable dollar obligation to a victim does not undercut the general rationality of the attribution of accountability which, we assume, animated the Legislature.'"  Id.  The Court found the same flaws inherent in the plaintiffs' due process clause argument also barred their equal protection clause argument.

In its conclusion, though, the Court stated, "we appreciate that there could be circumstances in which a statute or regulation that has valid application to an aggregate prison

---

[8]     Plaintiff alleges in his complaint "we are Philadelphia Inmates, who have been convicted of crimes in the state of Pennsylvania.  Most of us still have to pay court cost, fines, and Restitution where we committed our crime."

population the generality of whom are, like appellants, convicted felons, might nevertheless be open to challenge as applied to particular inmate sub-groups who do not share the characteristics that justify the constraints imposed by the challenged statute or regulation on the general prison population." Id. at 263. Here, plaintiff argues that he and other "Philadelphia Inmates" are just such a sub-group. As applied to the Philadelphia inmates, the VCCB surcharge is still "reasonably calculated to bring about in some significant degree the achievement of an appropriate legislative goal," because the VCCB surcharge on Philadelphia inmate purchases generate funds to help New Jersey compensate crime victims. The issue is whether the regulation is "arbitrary and capricious," i.e. is it reasonable to infer that the New Jersey Legislature regarded Philadelphia inmates "as a cohort whose members were in large measure accountable" for New Jersey's victims' harms? Myrie considered a similar concern in its analysis of whether the statute violated double jeopardy, ex post facto and bill of attainder protections:

> [T]he program adopted by the Legislature contemplated that the surcharge would be added to the price of all inmate purchases, including purchases by inmates who had already completed payment of sums owing to the VCCB. Also, the New Jersey inmate population presumably included-and continues to include-persons held in pre-trial custody, not convicted of any crimes. But this lack of one-to-one correspondence between a particular inmate's purchase and an identifiable and precisely quantifiable dollar obligation to a victim does not undercut the general rationality of the attribution of accountability which, we assume, animated the Legislature.

Myrie, 267 F.3d at 259 (3d Cir. 2001). The Court reiterated this point in its discussion of due process and equal protection rights: "noting the likelihood that some fraction of the inmate

population would not, in fact, owe anything to the VCCB, we stated that 'this lack of one-to-one correspondence between a particular inmate's purchase and an identifiable and precisely quantifiable dollar obligation to a victim does not undercut the general rationality of the attribution of accountability which, we assume, animated the Legislature." Id. at 263. For the same reason, requiring the Philadelphia inmates to pay the VCCB surcharge does not undercut the rationality of the New Jersey Legislature requiring all inmates of the Jail to pay the surcharge. See also Lepiscopo v. Harvey, 2006 WL 2403903 at * 4 (D.N.J. 2006) (holding the statute did not violate a non-New Jersey defendant's equal protection and due process rights).

### 2.    Grievance Procedures

Plaintiff alleges that he failed to receive any formal response to the grievances he filed despite the Jail's handbook statement that inmates will receive a response within a reasonable period of time. Plaintiff also alleges that Commissioner Giorla failed to respond to his letters. "[A] prison official's response or lack thereof to an inmate's Administrative remedies is not sufficient alone to hold the official liable in a civil rights action. The law is well-settled that there is no constitutional right to a grievance procedure." Spencer v. Kelchner, 2007 WL 88084, at * 7 (M.D. Pa. Jan. 9, 2007), citing Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 137-138 (1977). "Even if the prison provides for a grievance procedure, as the [Jail] does, violations of those procedures do not amount to a civil rights cause of action." Id., citing Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988); Hoover v. Watson, 886 F. Supp. 410, 418 (D. Del. 1995), aff'd 74 F.3d 1226 (3d Cir. 1995). Therefore, even assuming the prison officials failed to process Allen's grievances, no constitutional claim is stated.

14

### C. Eighth Amendment

#### 1. Excessive Fine

With respect to the VCCB surcharge, plaintiff's complaint may be construed as alleging a violation of the Eighth Amendment's ban on the imposition of excessive fines. The Eighth Amendment serves generally as a limitation on "the government's power to extract payments, whether in cash or in kind, as punishment for some offense." Austin v. United States, 509 U.S. 602, 609-10 (1993). However, "the prohibition is not confined to exactions imposed as an aspect of the criminal law enforcement process. A civil imposition, such as a civil forfeiture, which is adjudged 'excessive,' would fall within the purview of the constitutional bar." Myrie, 267 F.3d at 262, citing Austin, 509 U.S. at 607-08.

In Myrie, the Court of Appeals held that "the 10% surcharge . . . is not 'excessive' when viewed in the context of the reasons for its enactment" and dismissed plaintiffs' claim:

> Given that the alternative purpose assigned by the Legislature was to rescue the underfunded VCCB, the anticipated annual revenue from the 10% surcharge of between $1,200,000 and $1,500,000 (potentially augmented by matching federal funds) has not been shown to be excessive. Nor is there any persuasive showing that the 10% surcharge is excessive when considered from the perspective of the inmate purchasers: an addition of up to 10% to the price of a retail item may certainly be obnoxious (and, indeed, might well serve as a substantial disincentive to purchase expensive items-e.g., electronic equipment, automobiles, household appliances, works of art-of a sort not likely to be sold at a prison commissary), but such an increment cannot be perceived as skewing the commissary price structure in radical fashion; moreover, as noted above, the effective price increase for many commissary items is in fact not 10%, but 4%, since the 6% sales tax that would attach to numerous items in non-prison retail stores is not applicable to prison commissary sales.

<u>Id.</u> at 261.[9]  I will dismiss Allen's claim that the VCCB surcharge is excessive for the same reasons

stated by the Court of Appeals.[10]

### 2.    Cold Food

Plaintiff alleges that while the Jail's handbook states that inmates will be provided with

three meals daily and two of those will be hot, he was continually served cold food despite filing

grievances and refusing to eat the cold food.  In another action alleging a § 1983 violation against

the Passaic County Adult Correctional Institute for failure to serve two hot meals a day, the Court

of Appeals stated:

> We also agree with the District Court's dismissal of Laufgas's claim
> that the prison's failure to provide two hot meals a day constituted a
> violation of his constitutional rights.  As the District Court stated,
> while prisoners are guaranteed a nutritionally adequate diet under the
> Eighth Amendment, <u>see</u> <u>Ramos v. Lamm</u>, 639 F.2d 559, 571 (10th
> Cir. 1980), there is no constitutional right to hot meals.  <u>See</u>
> <u>Brown-El v. Delo</u>, 969 F.2d 644, 648 (8th Cir.1992) (finding
> frivolous prisoner's claim that his constitutional rights were violated
> when he was served cold food).

<u>Laufgas v. Speziale</u>, 263 Fed. Appx. 192, 198 (3d Cir. 2008), not precedential.  I will dismiss

plaintiff's claim for serving cold food for failure to state a claim.

---

[9]    The Court of Appeals also held, "the surcharge authorized by § 30:4-15.1 does
not constitute 'punishment' in the constitutional sense and hence its imposition on purchases
made by appellants at prison commissaries does not offend the double jeopardy, bill of attainder,
or ex post facto clauses of the federal Constitution."  <u>Myrie</u>, 267 F.3d at 262 (internal quotation
marks omitted).

[10]    Plaintiff alleges in his complaint "we are Philadelphia Inmates, who have been
convicted of crimes in the state of Pennsylvania.  Most of us still have to pay court cost, fines,
and Restitution where we committed our crime."  To the extent plaintiff argues that the VCCB
surcharge is an excessive fine when combined with other restitution sums, I find that plaintiff has
not alleged that he specifically was required to pay restitution to victims in Pennsylvania and thus
this argument is unsupported by the complaint.

### 3. Cold Water

Plaintiff alleges that while the Jail's handbook states that inmates will be provided with hot water for taking showers, from August 12 through November 29, 2008 and again from January 6, 2009 through at least January 20, 2009, the date plaintiff's complaint was filed, he was without any hot water. Thus, he was required to take cold showers during part of the winter.

In Blackiston v. Vaughn, 1998 WL 665477 (E.D. Pa. Sept. 24, 1998), this Court found that the plaintiff stated a claim for relief under the Eighth Amendment when he alleged that the prison in which he was confined failed to provide hot water; however, this Court's ruling was based on the additional allegations that the plaintiff was also denied heat, a winter hat and gloves. Id. at *6, citing Wilson v. Seiter, 501 U.S. 294, 304 (1991) ("Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise-for example, a low cell temperature at night combined with a failure to issue blankets."). Here, although plaintiff has alleged several deprivations, the combination of lack of hot water and cold food, collect calls, inability to attend religious services do not add up to an Eighth Amendment violation. Plaintiff does not claim that there was insufficient heat in the prison or a lack of warm clothes, which when combined with the cold showers may have had the "mutually enforcing effect" of depriving plaintiff of warmth. Therefore, I will dismiss this claim.

### 4. Recreation

Plaintiff alleges that the defendants required him "to be housed in an area for 23 hours a day with only one hour out for recreation." "Meaningful recreation is extremely important to the

psychological and physical well-being of the inmates,'" Peterkin v. Jeffes, 855 F.2d 1021, 1031 (3d Cir. 1988) (quoting Spain v. Procunier, 600 F.2d 189, 199 (9th Cir.1979)), and its denial "may result in a constitutional violation." Gattis v. Phelps, 2009 WL 2917703, at *3 (3d Cir. 2009). "[A] plaintiff must demonstrate that such a denial is sufficiently serious to deprive inmates of the minimal civilized measure of life's necessities." Gattis, at * 3 (citing Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 418 (3d Cir. 2000)). "Even minimal provision of time for exercise and recreation may satisfy constitutional requirements." Id. (citing Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992) (forty-five minutes of exercise per week not constitutionally infirm); Knight v. Armontrout, 878 F.2d 1093, 1096 (8th Cir. 1989) (holding that denial of outdoor recreation for thirteen days not cruel and unusual punishment)). Plaintiff's alleged harm--that his exercise is limited to one hour per day--is insufficiently serious to implicate the Eighth Amendment. I will dismiss this claim.

### 5.    Access to Programs

Additionally, plaintiff alleges that he is "not offered any of the programs that are offered to Passaic County inmates or any of the programs that are offered on State Road . . . It is [the defendants'] responsibility to ensure that contracted sites, like Passaic County, offer at least the same or compatible programs and jobs to help reduce recidivism [as those offered by the Philadelphia Prison System]." Plaintiff's inability to access programs or jobs to reduce recidivism is not a deprivation of a constitutional right. In Rhodes v. Chapman, 452 U.S. 337, 348 (1981), the Supreme Court considered a similar situation in which the plaintiff alleged that "double-celling" in the prison resulted in a reduction in the opportunity to participate in job and educational programs. The Court held, "limited work hours and delay before receiving education

18

do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments. We would have to wrench the Eighth Amendment from its language and history to hold that delay of these desirable aids to rehabilitation violates the Constitution." Id. Therefore, I will dismiss plaintiff's claim with respect to not receiving access to job and other programs.

### 6.      Unsanitary Conditions & Overcrowding

Plaintiff alleges that the Jail has a "long history of over-crowding unsanitary living conditions and show [sic] no respect for the rights of the inmates they are paid to house;" and that it has a "pattern of fixing problems temporarily, and then within a week or two re-vert back to the same inhumane practices."  Plaintiff alleges the Philadelphia Prison System "has failed to maintain the quality of living that we inmates are accustomed to."  He alleges that Commissioner Giorla "kn[ew of] the long history of unsanitary living conditions and over-crowding, and also . . . that Federal inmates that were housed here were removed."  He alleges that he was told the over-crowding was the reason that he was unable to receive hot water and was unable to attend religious services.  He alleges the "Jail has a capacity of 896 inmates, but operates with more than twice its capacity of inmates."  I read plaintiff's complaint to allege an Eighth Amendment violation arising out of the combination of all of the grievances.

"In actions challenging a large number of prison conditions, a district court . . . must inquire whether the challenged conditions alone or in combination violate eighth amendment standards, recognizing that the totality of the conditions may deprive inmates of the minimal civilized measure of life's necessities."  Peterkin, 855 F.2d at 1024 (internal quotation marks omitted).  "[T]he objective factors which a court must examine in prison conditions cases include

basic human needs such as food, shelter, and medical care, as well as sanitation, safety, the

physical plant, educational/rehabilitational programs, the length of confinement, and out-of-cell

time." Id. (internal quotation marks omitted). Furthermore, the Eighth Amendment does not

guarantee that prison conditions be comfortable, only that the conditions not be inhumane.

Farmer v. Brennan, 511 U.S. 825, 832 (1994).

Here, while plaintiff has raised a number of concerns, he has not alleged any conditions

related to the over-crowding, taken singly or as a whole, which give rise to any Eighth

Amendment concerns. He has not alleged that he had inadequate amounts of food, insufficient

shelter or medical care. While plaintiff alleges there is a history of unsanitary conditions at the

Jail, he has not pointed to any specific instances of unsanitary conditions that he experienced

while housed at the Jail. In fact, his complaint states that after he complained of a leaking toilet

that problem was fixed. Nor has he indicated that the over-crowding resulted in any presently

unsafe conditions. The over-crowding is alleged to have at least two impacts: a lack of hot water

and the ability to attend religious services. I will assume that the over-crowding is also the cause

of the one-hour recreation time, the access to rehabilitative services, cold food, and collect calls.

In combination, these alleged conditions clearly would have made life uncomfortable for

plaintiff. However, plaintiff has not alleged that they created an "excessive risk to his health or

safety," Tampico v. Holt, 2006 WL 860683, *3 (M.D. Pa. 2006), or otherwise deprived him of

life's necessities. Thus, I will dismiss plaintiff's Eighth Amendment claims as they relate to

unsanitary and over-crowded conditions.

### III.    Prison Transfer

Finally, the thrust of Allen's complaint is aimed at the Philadelphia Prison System and

Commissioner Giorla for negligently transferring him to the Passaic County Jail while knowing of the Jail's history of unsanitary and overcrowded conditions and that plaintiff would be deprived of his constitutional rights as a result.

Initially, the Philadelphia Prison System is a department of the City of Philadelphia and is not a separate legal entity capable of being sued. See 53 Pa. Cons. Stat. § 16257; Griffith v. Phila. Prison Sys., 2001 WL 876804 , at *2 n.1 (E.D. Pa. May 18, 2001) (dismissing all claims against the Philadelphia Prison System because it is a "municipal agency of the City of Philadelphia" that cannot be sued). Thus, I will dismiss all of plaintiff's remaining claims against the Philadelphia Prison System, but will grant plaintiff leave to amend his complaint to name the City of Philadelphia.

Commissioner Giorla claims immunity from liability under the doctrine of qualified immunity. I must construe Allen's complaint liberally and in the light most favorable to him; I will reject this defense at this stage in the proceedings because Commissioner Giorla is alleged to have known about the over-crowding conditions at the Jail which may have resulted in a deprivation of plaintiff's First Amendment rights. If such a violation is proven, the Commissioner's authorization of the transfer of the Philadelphia inmates would exceed the scope of his official duties. Commissioner Giorla has broad discretion to enter into contracts to transfer inmates pursuant to state laws authorizing him to do so; plaintiff must prove that Commissioner Giorla knew this transfer would result in the deprivation of plaintiff's First Amendment rights and that he acted in disregard of this knowledge.